DAVID ZARMI
California Bar No. 245636
8950 W Olympic Blvd., Ste. 533
Beverly Hills, CA 90211
310-841-6455
davidzarmi@gmail.com

*Attorney for Defendant*
Oxnard Healthcare & Wellness Centre, LP

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

WESTERN DIVISION

| | |
|---|---|
| ANNA SIGALA, deceased, by and through her personal legal representative and successor in interest, ANTHONY SIGALA; ANTHONY SIGALA, individually,<br><br>Plaintiffs,<br><br>vs.<br><br>OXNARD MANOR, LP dba OXNARD MANOR HEALTHCARE CENTER, a California Skilled Nursing Facility; BERTIE KRIEGER, an individual; SHLOMO RECHNITZ, an individual; OXNARD HEALTHCARE & WELLNESS CENTRE, LP, a California Limited Partnership; and DOES 1 to 100, inclusive,<br><br>Defendants. | Case No. 2:22-cv-2003<br><br>**NOTICE OF REMOVAL**<br><br>**[Re: Ventura County Superior Court Case No. 56-202100561668-CU-PO-VTA]** |

COMES NOW, Defendant OXNARD HEALTHCARE & WELLNESS CENTRE, LP ("Defendant"),[1] by and through its undersigned counsel, hereby removes this action from the Superior Court of the State of California, County of Ventura, to the United States District Court for the Central

---

[1] Only Oxnard Healthcare & Wellness Centre, LP appears to have been served (*see* Ex. A, Summons). This Notice of Removal does not constitute an appearance on behalf of any other defendants.

District of California, Western Division, reserving all defenses and reserving all objections to venue based on 42 U.S.C. § 247d-6d(e)(1), pursuant to 28 U.S.C. §§ 1441, 1442, and 1446, on the following grounds:

## I.   STATEMENT OF THE CASE

1. This action was filed in the Superior Court of the County of Ventura, California as Case No. 56-202100561668-CU-PO-VTA on December 29, 2021.  (Ex. A, Summons & Complaint.)

2. Defendant was served with the Summons and Complaint on February 23, 2022.  (Ex. A.)  Accordingly, this Notice of Removal is timely.  *See* 28 U.S.C. § 1446(b); Fed. R. Civ. Proc. 6(a)(1).

3. The Complaint asserts causes of action for (1) elder abuse and neglect; (2) violation of patient rights (Health & Safety Code § 1430(b); (3) negligence; and (4) wrongful death resulting from alleged misconduct by a covered person in the administration of a covered countermeasure under the Public Readiness and Emergency Preparedness Act (["PREP Act"], 42 U.S.C.A. §§ 247d-6d(d), 247d-6.  (Ex. A, Compl. at 1.)

4. More specifically, Plaintiffs claim that Oxnard Manor Healthcare Center ("Oxnard"), a California licensed nursing facility, engaged in negligent, willful and/or reckless conduct in the care rendered to Anna Sigala ("Decedent") in relation to exposure, diagnosis, and treatment of COVID-19 and in the distribution, administration, or use of medical countermeasures, like COVID-19 testing and personal protective equipment, to prevent the spread of COVID-19 and as a result thereof she died.  (*See, e.g.*, Ex. A, Compl. at 10.)

5. The Complaint seeks damages including, general damages, special damages, punitive damages, exemplary damages, interest, attorney's fees, and costs of suit.  (Ex. A, Compl. at 24.)

## II.   PROCEDURAL REQUIREMENTS

6. This notice is filed on behalf of Defendant in the above-styled case pursuant to 28 U.S.C. § 1446(b)(2)(A).

7. Concurrent with the filing of this Notice or promptly thereafter, Defendant is serving this Notice of Removal on all other parties pursuant to § 1446(d).

8. Pursuant to § 1446(a), copies of pleadings and documents from the Superior Court for the County of Los Angeles served upon or provided to Defendant are attached as Exhibit A.

### III. FEDERAL QUESTION JURISDICTION UNDER 28 U.S.C. § 1441(a)

9. This case is removable under 28 U.S.C.A. § 1441(a) on the basis of original jurisdiction because Plaintiffs assert a claim arising under federal law withing the meaning of § 1331.

10. On its face, the allegations contained in the Complaint reflect that a "covered person" was involved in "recommended activity" relative to a "covered countermeasure" and therefore presents a federal question under the PREP Act, 42 U.S.C. §§ 247d-6d, 247d-6e.

11. As such, Congress provided an exclusive remedy for the substance of the allegations, and relief sought in the Complaint and Federal law expressly pre-empts state law for purposes of federal question jurisdiction.  §§ 247d-6d, 247d-6e.

12. Federal courts have found "complete preemption" where a federal statute expressly preempts state law and creates an exclusive federal remedy for preempted state claims. *See, e.g.*, *Fossen v. Blue Cross & Blue Shield of Mon., Inc.*, 660 F.3d 1102, 1107 (9th Cir. 2011); *In re WTC Disaster Site*, 414 F.3d 352, 380 (2d Cir. 2005); *Spear Marketing, Inc. v. Bancorp South Bank*, 791 F.3d 586 (5th Cir. 2015); *Nott v. Aetna U.S. Healthcare, Inc.*, 303 F.Supp.2d 565 (E.D. Pa. 2004).  Further, federal defenses that will be asserted by defendants are sufficient to invoke complete preemption. *Jefferson Cty. v. Acker*, 527 U.S. 423, 431 (1999).

13. Here, as set forth below, Defendant asserts that the claims alleged in the Complaint and the defenses to them are completely preempted by the PREP Act sections found at §§ 247d-6d and 247d-6e.  *See Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 253 (2011) (Sotomayor, J., dissenting) (where the majority found the National Childhood Vaccine Injury Act preempted state law, Justices Sotomayor & Ginsburg further analyzed that the PREP Act unequivocally demonstrated intent to completely preempt state law through its use of "categorical (e.g., 'all') and/or declarative language (e.g., 'shall')").

14. Under § 247d-6d(a), a "covered person" is afforded broad immunity for all "claims for loss arising out of, relating to, or resulting from" the "administration" or "use" of a "covered

countermeasure" as those terms are defined by that section, provided the Secretary of the Department of Health and Human Services (HHS) issues a declaration to that effect.

15. For all claims barred by immunity under § 247d-6d that do not assert "willful misconduct," the exclusive remedy for relief is established under § 247d-6e, which permits an individual to make a claim for benefits through the Countermeasures Injury Compensation Program, also known as the Fund, for a "covered injury directly caused by the administration or use of a covered countermeasure." In fact, and for purposes of illustrating Congress's intent to address all claims, even a claimant alleging "willful misconduct" must first apply for benefits through the Fund under § 247d-6e before bringing an action under § 247d-6d(d). § 247d-6e(d)(1). Further, even where a plaintiff has alleged willful misconduct and exhausted his remedies relative to the Fund, such plaintiff is limited to "*an exclusive Federal cause of action*" for willful misconduct "maintained only in the United States District Court for the District of Columbia." § 247d-6d(d)-(e)(1) (emphasis added).

16. Moreover, under § 247d-6d(b)(8), state law that "is different from, or in conflict with, any requirement applicable [for immunity]" is expressly preempted.

17. Therefore, Congress has clearly manifested the intent to preempt state law with respect to claims or defenses that invoke PREP Act immunity and to create an exclusive federal remedy for such preempted claims, thereby "completely preempting" state law for purposes of federal question jurisdiction. *See Bruesewitz*, 562 U.S. at 253.

18. Here, as alleged in the Complaint, Defendant is a "covered person[s]" in that it is a SNF licensed by the State of California. (Ex. A, Compl. at 2.) Further, Defendant, as well as its employees and affiliates are "covered persons" because each meet the requirements of a "program planner" of countermeasures under the PREP Act and are "qualified persons who prescribed, administered or dispensed" a countermeasure under the PREP Act. This was confirmed by the Office of the General Counsel, HHS in an opinion letter dated August 14, 2020, stating that senior living communities administering covered countermeasures are "covered persons," entitled to immunity under the PREP Act by virtue of their status as both "program planners" and "qualified persons." (Attached as Exhibit B.)

19. Plaintiffs' claims "arise[] out of, relate[] to, or result[] from" the administration and use of a "covered countermeasure" obtained through a "means of distribution," to a "population," and within a "geographic area," or reasonably believed so by Defendant, for the purpose of treating, diagnosing, curing, preventing, or mitigating COVID-19, or the transmission of SARS-CoV-2 or a virus mutating therefrom, as such terms are defined within the PREP Act, §§ 247d-6d, 247d-6e, the Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19, 85 Fed. Reg. 15198 (Mar. 17, 2020), amended by 85 Fed. Reg. 21012 (Apr. 15, 2020), and all corresponding amendments, regulations, and interpretational case law.

20. At the time of the allegations set forth in the Complaint, and based on such allegations, Defendant was acting as "program planner[s]" that supervised the infection control policy program, under which FDA-approved personal protective equipment including, inter alia, N95 respirators, face shields, and gowns as well as diagnostic countermeasures were distributed and administered to Decedent and Defendant's staff in an effort to diagnose, mitigate, and prevent COVID-19, or the transmission of SARS-CoV-2 or a virus mutating therefrom. Further, Defendant's employees and affiliates were acting as employees of "program planner[s]" that supervised and administered the infection control program that provided and used FDA-approved countermeasures on Decedent and the Oxnard staff in an effort to diagnose and mitigate COVID-19, or the transmission of SARS-CoV-2 or a virus mutating therefrom.

21. At the time of the allegations set forth in the Complaint, and based on such allegations, Defendant's employees and affiliates were acting as "qualified persons" because Defendant's employees were authorized to administer, deliver, and use FDA-covered countermeasures, like personal protective equipment and FDA-approved COVID-19 devices, medication, and diagnostic tests to diagnose and prevent COVID-19, or the transmission of SARS-CoV-2 or a virus mutating therefrom.

22. At the time of the allegations set forth in the Complaint, and based on such allegations, Defendant was engaged in the management and operation of countermeasure programs in an effort to diagnose and prevent COVID-19, or the transmission of SARS-CoV-2 or a virus mutating therefrom to a "population" and within a "geographic area" specified by the Declaration under the PREP Act for

Medical Countermeasures against COVID-19, 85 Fed. Reg. 15198 (Mar. 17, 2020), and all amendments thereto ("Declaration"), or reasonably believed so by Defendant. Likewise, Defendant's employees and affiliates were physically providing the countermeasures to Decedent and using the countermeasures in an effort to diagnose and prevent COVID-19, or the transmission of SARS-CoV-2 or a virus mutating therefrom to a "population" and within a "geographic area" specified by the Declaration, and all amendments thereto, or reasonably believed so by Defendant. The HHS Secretary confirmed the same in a guidance letter dated August 31, 2020 that diagnostic testing for COVID-19 in senior living communities qualifies as a "covered countermeasure" triggering PREP Act immunity. (Attached as Exhibit C.)[2]

23. At the time of the allegations set forth in the Complaint, the respirators and PPE used by Defendant were approved by the FDA as a qualified pandemic or epidemic product and were respiratory protective devices approved by the National Institute for Occupational Safety and Health under 42 CFR part 84, and were administered, delivered, distributed, and dispensed in accordance with the public health and medical response of the State of California or reasonably believed so by Defendant. As noted above, Plaintiffs' claims "arise[] out of, relate[] to, or result[] from" the administration and use of such "covered countermeasures."

24. On January 8, 2021, HHS General Counsel issued new controlling authority (hereinafter "AO 21-01," attached as Exhibit D)[3] confirming unequivocally that: (1) the PREP Act is invoked by allegations like those in the Complaint, including alleged inaction or failure to act; (2) the PREP Act is a "'Complete Preemption' Statute" which confers federal question removal jurisdiction under 28 U.S.C. § 1441(a); and (3) as discussed in more detail below, federal jurisdiction is separately conferred in such cases under the doctrine articulated by the Supreme Court in *Grable & Sons Metal Prod., Inc. v. Darue*

---

[2] Also available at https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/prep-act-coverage-for-screening-in-congregate-settings.pdf.
[3] Also available at https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/2101081078-jo-advisory-opinion-prep-act-complete-preemption-01-08-2021-final-hhs-web.pdf.

*Eng'g & Mfg.*, 545 U.S. 308 (2005), because "ordaining the metes and bounds of PREP Act protection in the context of a national health emergency necessarily means that the case belongs in federal court." (Emphasis added.)

25. AO 21-01 unequivocally states that "[t]he PREP Act is a 'Complete Preemption' Statute," because it establishes both a federal and administrative cause of action as the only viable claim, and vests exclusive jurisdiction in federal court." (Ex. D at 2.)

26. AO 21-01 rejects the notion that immunity under the PREP Act requires actual "use" of a covered countermeasure. Specifically, AO 21-01 provides that "this 'black and white' view clashes with the plain language of the PREP Act, which extends immunity to anything 'relating to' the administration of a covered countermeasure." (Ex. D at 3.)

27. Specifically, AO 21-01 provides that "[p]rioritization or purposeful allocation of a Covered Countermeasure, particularly if done in accordance with a public health authority's directive, can fall within the PREP Act and this Declaration[']s liability protections.  There can potentially be other situations where a conscious decision *not* to use a covered countermeasure could relate to the administration of the countermeasure." (Ex. D at 3, emphasis added.)  Thus, "program planners" fall within the set of "covered persons" under the PREP Act and the "decision-making that leads to the ***non-use*** of covered countermeasures by certain individuals is the grist of program planning, and is expressly covered by PREP Act." (*Id.* at 4, emphasis added.)

28. In the fourth amendment to the Declaration, the HHS Secretary expressly addressed ***inaction***, as the Secretary defined "administration" of covered countermeasures to include not only physical use, but ***non-use***, such as activities and decisions, as well as management and operation, of countermeasure programs generally.  This distinction makes "explicit that there can be situations where ***not administering*** a covered countermeasure to a particular individual can fall within the PREP Act and this Declaration's liability protections." 85 Fed. Reg. 79190, 79194 (emphasis added) & 79197 (examples of such situations) (Dec. 9, 2020).

29. Because Defendant and its employees are Covered Persons and because Plaintiffs' allegations concern Defendant's conscious decisions to use or not use covered countermeasures, including "implementing policies and procedures relating to infectious diseases" and PPE, the Complaint's claims and Defendant's defenses squarely fall within the PREP Act.

30. As confirmed in AO 21-01, when the PREP Act is triggered, complete preemption attaches. Indeed, "[t]he *sine qua non* of a statute that completely preempts is that it establishes either a federal cause of action, administrative or judicial, as the only viable claim or vests exclusive jurisdiction in a federal court. The PREP Act does both." (Ex. D at 2.)

31. AO 21-01 is binding on this court, as the HHS Secretary incorporated all HHS Advisory Opinions pertaining to COVID-19 into the PREP Act's implementing Declaration itself and proclaimed that the Declaration "must" be construed in accordance with them. 85 Fed. Reg. at 79191. As such, the HHS Advisory Opinions are no longer "advisory," as they now have the same "controlling weight" as the Declaration and the PREP Act itself. Where Congress has expressly delegated interpretative authority to an agency, that agency's interpretative proclamations are controlling on the federal courts. *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 843-44 (1984). To avoid any doubt on this point, the Secretary amended the Declaration for a fifth time, confirming again in the Declaration itself that the PREP Act is a complete preemption statute. 86 Fed. Reg. 7872, 7873-74 (Feb. 2, 2021).[4] Congress has reinforced the Secretary's ultimate authority over these matters concerning the PREP Act, and warns that "[n]o court . . . shall have subject matter jurisdiction to review, whether by mandamus or otherwise, any action by the Secretary under [the PREP Act]." 42 U.S.C. § 247d-6d(b)(1), (4) & (7). Thus, the federal courts must follow AO 21-01's controlling authority that the PREP Act is a complete preemption statute.

32. AO 21-01 itself was preceded by other HHS authorities that have provided guidance to the courts in construing the PREP Act. For example, Advisory Opinion 20-04 confirms that any

---

[4] Notably, this Fifth Amendment was done under the Biden Administration, meaning that the HHS's interpretation of the PREP Act is nonpolitical.

individual or organization can potentially be a program planner and receive PREP Act coverage--"even grocery stores, universities, private businesses, places of worship, and private transportation providers."[5] And, as described above, HHS issued separate guidance letters specifically confirming that residential care facilities for the elderly are program planners or qualified persons under the PREP Act when they administer or use diagnostic testing and other covered countermeasures.  (*See* n.1, *ante*.)

33.  In a recent case with allegations similar to the instant one, and following a motion to remove from California state court, the court in *Garcia v. Welltower OpCo Group LLC*, 2021 U.S. Dist. LEXIS 25738 (C.D. Cal. Feb. 10, 2021) denied the plaintiff's motion to remand and granted the defendants' motion to dismiss.  The court there found that the plaintiff's allegations included the "use and misuse of PPE" and detailed "infection control measures and procedures including symptom checking, staff monitoring and screening, and limiting visitation."  (*Id.* at *8.)  Specifically, the Court held: (1) "[t]he acts and omissions alleged by Plaintiffs appear almost verbatim in the January 8, 2021 Advisory Opinion" and, accordingly, the PREP Act applied to the plaintiffs' claims (*id.* at *14); (2) "because the OGC stated [in the January 8, 2021 Advisory Opinion] that the PREP Act is a complete preemption statute . . . an adequate basis for federal question jurisdiction exists" (*id.*); (3) prior federal opinions holding that the PREP Act did not provide a basis for federal question jurisdiction preceded more recent guidance from the OGC (Advisory Opinion published January 8, 2021), which established that "when a party attempts to comply with federal guidelines--in this case the COVID-19 pandemic--the PREP Act would provide complete preemption" (*id.* at 10); and (4) "While the Court acknowledges that certain allegations relate to a failure to abide by local or federal health guidelines, these allegations related to momentary lapses.  Taken as true, all Plaintiffs' FAC discloses are possible unsuccessful attempts at compliance with federal or state guidelines--something which the PREP Act, the Declaration, and the January 8, 2021 Advisory Opinion cover."  (*Id.* at 14.)

---

[5] Available at https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/AO%204.2_Updated_FINAL_SIGNED_10.23.20.pdf.

34. Furthermore, since the *Garcia* decision, the HHS Secretary amended the Declaration a sixth time, reaffirming, "The plain language of the PREP Act makes clear that there is preemption of state law as described above." 86 Fed. Reg. 9516, 9517 (Feb. 16, 2021);[6] *see generally Rachal v. Natchitoches Nursing & Rehab. Ctr., LLC*, 2021 U.S. Dist. LEXIS 105847, *4 n.3 (W.D. La. Apr. 30, 2021).[7]

35. Despite Plaintiffs' assertion of state law claims, because the PREP Act offers complete preemption, jurisdiction over the claims is exclusively federal. *See Beneficial Nat. Bank v. Anderson*, 539 U.S. 1, 8 (2003) ("[w]hen the federal statute completely preempts the state-law cause of action, a claim which comes within the scope of that cause of action, even if pleaded in terms of state law, is in reality based on federal law"). Thus, under preemption doctrine alone, removal is proper under 28 U.S.C. § 1441(a).

36. In addition to complete preemption, AO 21-01 confirms that the PREP Act confers separate, independent grounds for federal question jurisdiction under the *Grable* doctrine. AO 21-01 highlights the Secretary's conclusion in the Declaration that "there are substantial federal legal and policy issues, and substantial federal legal and policy interests within the meaning of [the Grable doctrine] in having a unified, whole-of-nation response to the COVID-19 pandemic among federal, state, local, and private sector entities." (Ex. D at 5 (quoting 85 Fed. Reg. at 79197).)

37. The Advisory Opinion's interpretation of *Grable* is consistent with the Supreme Court's long-standing rule "that in certain cases federal question jurisdiction will lie over state-law claims that implicate federal issues." *Grable*, 545 U.S. at 312. "The doctrine captures the commonsense notion that a federal court ought to be able to hear claims recognized under state law that nonetheless turn on

---

[6] *See* n.3, *ante*, regarding the nonpolitical nature of the HHS interpretation.
[7] While the recent Ninth Circuit decision in *Saldana v. Glenhaven Healthcare LLC* (20-56194), decided on February 22, 2022 held to the contrary of Garcia, the matter is currently pending rehearing and rehearing en banc. Defendant will update this Court in subsequent pleadings on the status of that case as it progresses.

substantial questions of federal law, and thus justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." *Id.*

38. The *Grable* Court determined that no single, precise test exists for determining whether an embedded federal issue exists, but that, in general, a two-step process exists for determining whether a state law claim "arises under" federal law: (1) the state law claim must necessarily raise a stated federal issue that is actually disputed and substantial; and (2) federal courts must be able to entertain the state law claims "without disturbing a congressionally approved balance of state and federal judicial responsibilities." *Grable*, 545 U.S. at 314. Here, both prongs are satisfied.

39. First, Plaintiffs bring a claim as a result of Defendant's alleged use or administration (or nonuse or non-administration) of covered countermeasures in connection with the care and treatment of the Decedent, which necessarily implicates disputed and substantial federal issues. *See* 42 U.S.C. § 247d-6d.

40. Second, as confirmed by the Advisory Opinion and the Declaration, the PREP Act expresses a clear intention to supersede and preempt state control of the very issues raised by Plaintiffs, i.e., issues concerning Defendant's decisions to use or not use covered countermeasures, including the use or non-use of PPE. A substantial and disputed federal issue regarding the application of the PREP Act to Plaintiffs' claims therefore necessarily exists and must be resolved by this Court to ensure the uniform and appropriate application of the PREP Act.

41. Courts have long recognized federal jurisdiction under the *Grable* doctrine. *See, e.g.*, *McKay v. City & Cty. of San Francisco*, 2016 U.S. Dist. LEXIS 178436, *13-14 (N.D. Cal. Dec. 23, 2016) (finding federal jurisdiction under *Grable* where plaintiff's request that court enjoin use of flight paths was "tantamount" to a challenge to the validity of an FAA decision); *Bender v. Jordan*, 623 F.3d 1128, 1131 (D.C. Cir. 2010) (finding federal jurisdiction under *Grable* where breach of contract action arose under federal law because agreement was required by federal law and turned on interpretation of federal regulations).

42. The two-step process is also satisfied where the alleged dispute "could have" supported the defendant's assertion of a federal declaratory judgment action. *See Hollyvale Rental Holdings, LLC v. Baum*, 2018 U.S. Dist. LEXIS 56435, at *9 [2018 WL 1608411, at *3] (D. Nev. Mar. 31, 2018) (*Grable* federal question jurisdiction existed under the "coercive action" doctrine where defendant "could have . . . brought a separate federal declaratory judgment action").

43. The *Grable* doctrine and PREP Act are thus directly applicable to Plaintiffs' claims in any event and support this Court's jurisdiction.

### IV. FEDERAL OFFICER JURISDICTION UNDER 28 U.S.C. § 1442(a)(1)

44. This case is further removable under 28 U.S.C. § 1442(a)(1), which provides for removal when a defendant is sued for acts undertaken at the direction of a federal officer. "Unlike the general removal statute, the federal officer removal statute [Section 1442(a)] is to be 'broadly construed' in favor of a federal forum." *In re Commonwealth's Motion to Appoint Counsel against or Directed to Def. Ass'n of Philadelphia*, 790 F.3d 457, 466 (3d Cir. 2015). The case is removable pursuant to § 1442(a) because "(1) Defendants are 'persons' within the meaning of the statute; (2) the Plaintiff's claims are based upon Defendants' conduct 'acting under' the United States, its agencies, or its officers; (3) the Plaintiff's claims are 'for, or relating to' an act under color of federal office; and (4) Defendants raise a colorable federal defense to the Plaintiff's claims." *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 811 (3d Cir. 2016). All requirements for removal under § 1442(a)(1) are satisfied here.

45. The "acting under" requirement, like the federal removal statute overall, is to be "liberally construe[d]" to cover actions that involve "an effort to assist, or to help carry out, the federal supervisor's duties or tasks." *Ruppel v. CBS Corp.*, 701 F.3d 1176, 1181 (7th Cir. 2012) (quoting *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 147 (2007)); *see In re Commonwealth*, 790 F.3d at 468. To satisfy the second requirement, "a private person's actions 'must involve an effort to assist, or to help carry out, the duties or tasks of the federal superior.'" *Watson*, 551 U.S. at 152. Federal courts "have explicitly rejected the notion that a defendant could only be 'acting under' a federal officer if the complained-of conduct was done at the specific behest of the federal officer or agency." *Papp*, 842 F.3d at 813. Instead, a specific instruction from a federal officer or a detailed regulation to compel specific

conduct satisfies the second requirement. *See, e.g., Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d. 387, 398-99 (5th Cir. 1998) (the federal government's specifications for the composition of Agent Orange conferred federal officer jurisdiction on the independent contractor); *Jane Doe v. UMPM*, 2:20-cv-00359 (W.D. Pa. July 31, 2020) (hospital's creation and enhancement of website to encourage its use to further goals of DHHH's push for shareable electronic medical records conferred federal officer jurisdiction; whether federal law preempts state law and whether a private entity's conduct was outside the scope of its federal duties "is the very thing that should be left to a federal court to decide").

46.  Here, Defendant, in taking steps to prevent the spread of COVID-19, did so in compliance with CDC and CMS directives, which were aimed at helping achieve the federal government's efforts at stopping or limiting the spread of COVID-19.  On March 10, 2020, CMS published a memorandum clarifying and amending policies and guidance in light of the CDC's expansion of the types of facemasks healthcare workers may use in situations involving COVID-19.[8]  In doing so, CMS acknowledged the federal government was taking "critical steps" to prepare health care facilities to respond to COVID-19 and acknowledged the need to "explore flexibilities and innovative approaches within our regulations to allow health care entities to meet the critical health needs of the country."  The memorandum issued on this date cites specifically to updated guidance from the CDC addressing the supply, allocation, and use of various items utilized to prevent the spread of infection and directly treat the virus.

47.  Furthermore, Defendant, in offering skilled nursing facilities and care, is subject to a high degree of federal regulation enacted to achieve the federal objective of allowing each resident in long term care facilities to "attain and maintain [] highest practicable physical, mental, and psychosocial well-being." § 1396r; *see* § 1395i-3; 42 C.F.R § 483.  Providers of services seeking to participate in the Medicare or Medicaid program, or both, must enter into an agreement with the HHS Secretary or the state Medicaid agency, as appropriate.  Long term care facilities seeking to be Medicare and Medicaid providers of services must be certified as meeting federal participation requirements.  81 FR 68688.  The

---

[8] Centers for Medicare & Medicaid Services, Guidance for use of Certain Industrial Respirators by Health Care Personnel (March 10, 2020) (available at https://www.cms.gov/files/document/qso-20-17-all.pdf).

federal government has a stated objective to provide for the care of nursing home residents and created a mandatory federal regulatory framework to convert the private entities such as Oxnard previously performing this service as federal officers or agents.

48. The present COVID-19 pandemic resulted in several new regulations directives, guidance and requirements issued as a result of the Federal government acting through the regulatory framework of CMS and the CDC to convert nursing homes into frontline responders to the national COVID crisis. Indeed, the CDC acknowledged that current knowledge of the nature of the virus was evolving, and that these efforts were part of an "ongoing US public health response to identify and contain this outbreak and prevent sustained spread of 2019-nCov in the United States."[9] CMS directed infection control efforts and clarified CDC guidance to preserve scarce medical resources, including PPE, and maximizing the capacity of the healthcare system to navigate the spread of the pandemic. Further, CMS ordered facilities to restrict visitors, cancel communal activities, screen staff, amend policies regarding interaction with vendors, and handle potential end-of-life interactions with family members, among other interventions.[10] On April 2, 2020, CMS issued new guidelines aimed specifically to long-term care facilities to mitigate the spread of COVID-19, with the stated purpose of 'critical, needed leadership" and issuing "immediate" actions to "keep patients and residents safe."[11]

49. Specifically, CMS directed long-term care facilities to "immediately" ensure compliance with "all CMC and CDC guidance related to infection control." Again, CMS specifically referenced and referred facilities to updated and revised CDC guidelines. CMS also implemented a number of actions to be undertaken immediately including 1) universal screening; 2) conservation of PPE; 3) proper PPE use; and 4) allocation of separate staffing, among other directives. As has been previously stated, instructions were part of mandatory regulations imposed on long term care facilities by OBRA and

---

[9] Centers for Disease Control and Prevention, Update and Interim Guidance on Outbreak of 2019 Novel Coronavirus (February 1, 2020) (available at https://emergency.cdc.gov/han/HAN00427.asp).
[10] Centers for Medicare & Medicaid Services, Guidance for Infection Control and Prevention of Coronavirus Disease 2019 (COVID-19) in Nursing Homes (Revised) (March 13, 2020) (available at https://www.cms.gov/files/document/qso/20-14-nh-revised.pdf).
[11] Centers for Medicare & Medicaid Services, COVID-19 Long-Term Care Facility Guidance (April 2, 2020) (available at https://www.cms.gov/files/document/4220-covid-19-long-term-care-facility-guidance.pdf).

regulations issued by CMS.  On April 19, 2020, CMS announced new regulatory requirements requiring nursing facilities to inform residents, families, and representatives of COVID-19 cases.[12]  Nursing homes were required to report COVID-19 cases and deaths directly to the CDC on an ongoing basis as the result of an unprecedented CMS regulatory requirement issued on May 1, 2020.  The Trump Administration implemented the new reporting requirement to develop a robust federal disease surveillance system to quickly identify problem areas and inform future infection control actions.  By law, CMS regulates and oversees nursing homes, which are certified to provide Medicare and/or Medicaid skilled nursing facility services.  This clearly demonstrates the fact that Defendant was acting at the direction of the federal government and as its agent in responding to COVID-19 response.

50.     Defendant, in following these directives, was engaged in an effort to assist, or to help carry out, the duties or tasks of CMS and the CDC in responding to the COVID-19 pandemic.  Defendant's actions and conduct were taken due to unprecedented and "strong government intervention" which went beyond the "mere auspices of federal direction." *Fung v. Abex Corp.*, 816 F. Supp. 569, 572 (N. D. Cal. 1992).  CMS was controlling and reimbursing Defendant for actions taken in response to the COVID-19 pandemic and then-President Trump's proclamation declaring a national emergency concerning the novel COVID-19 outbreak on March 13, 2020.  Following the national emergency proclamation, rapid action was taken to waive restrictions and expand capacity for healthcare entities, providers, and suppliers to coordinate a national response to the national emergency.  The national response effort converted Defendant into an agent of the United States.

51.     Finally, Defendant satisfies the "nexus" or "causation" requirement for federal officer jurisdiction as the alleged conduct was undertaken "for or relating to" a federal office.  To meet this requirement, "it is sufficient for there to be a connection or association between the act in question and the federal office." *In re Commonwealth*, 790 F.3d at 471.  There is a clear causal nexus between the claims against Defendant and the actions taken by Defendant in responding to and administering care

---

[12] Centers for Medicare & Medicaid Services, Press Release "Trump Administration Announces New Nursing Homes COVID-19 Transparency Effort" (April 19, 2020) (available at https://www.cms.gov/newsroom/press-releases/trumpadministration-announces-new-nursing-homes-covid-19-transparency-effort).

related to the COVID-19 outbreak.  As described above, the Complaint alleges deficiencies in Defendant's actions concerning infection control procedures taken in efforts to prevent the transmission and spread of COVID-19 while preserving resources to enable a nationwide response.  The nexus element is thus met by the various orders, guidelines, and recommendations followed by Defendant in addressing same.

52. In addition, Defendant meets the requirement of the existence of a colorable federal defense as it intends to assert that immunity under the PREP Act applies to the present action.  For the purposes of removal, the defense must be "colorable" and need not be "clearly sustainable" as the purpose for the removal statute is to secure that the validity of the defense may be tried in federal court.  *Willingham v. Morgan*, 395 U.S. 402, 407 (1969).  The Supreme Court explained that "one of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court." *Acker*, 527 U.S. at 431.  For this reason, "we have rejected a narrow, grudging" approach when analyzing whether a defendant had raised a colorable federal defense. *Id.*  Based on the preemption argument alone, Defendant has a colorable defense under the PREP Act, and this element is satisfied.

53. Removal is thus proper under federal officer jurisdiction in addition to federal question jurisdiction under the complete preemption exception and the *Grable* doctrine.

//
//

**WHEREFORE**, having shown that this case is properly removable on the basis of federal question jurisdiction and federal officer jurisdiction, Defendant provides notice pursuant to 28 U.S.C. § 1446 that the Action pending in Superior Court for the County of Ventura, California, case no. 56-202100561668-CU-PO-VTA, is removed to the United States District Court for the Central District of California, Western Division, and respectfully requests that this Court exercise jurisdiction over this case.

Respectfully submitted this 25th day of March, 2022.

**ZARMI LAW**

By: /s_David Zarmi
8950 W Olympic Blvd., #533
Beverly Hills, CA 90211
310-841-6455
davidzarmi@gmail.com
*Attorney for Defendant*
Oxnard Healthcare & Wellness Centre, LP

**CERTIFICATE OF SERVICE**

I hereby certify that on this 25th day of March, 2022, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will then be sent Electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent by first class mail to any counsel of record indicated as non-registered participants.

Dated: March 25, 2022                                               /s_ David Zarmi_____
                                                                                     *Attorney for Defendant*

*Attorneys for Plaintiffs*:
Allen R. Oghassabian, SBN 292653
Christian R. Oliver, SBN 313192
THE BARNES FIRM
655 W. Broadway, Ste 940
San Diego, California 92101
Tel: 800.800.0000 Fax: 888.800-7050
allen.oghassabian@thebarnesfirm.com
christian.oliver@thebarnesfirm.com

# EXHIBIT A